1
2
3
4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   PASCUAL HILARIO PANKIM,                Case No.  20-cv-02941-JSC

              Petitioner,
8
                                           **ORDER RE: PETITION FOR WRIT OF**
9         v.                               **HABEAS CORPUS**

10  WILLIAM P. BARR, et al.,                Re: Dkt. No. 1

              Respondents.
11

12

13         Petitioner Pascual Hilario Pankim ("Mr. Hilario") is a citizen and national of Guatemala

14  who has been continuously residing in the United States for the past 6 years.  The Department of

15  Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE") detained Mr.

16  Hilario in August 2019, and since then he has been held at the Yuba County Jail in Marysville,

17  California pursuant to 8 U.S.C. § 1231(a)(6).[1]  Now before the Court is Mr. Hilario's petition for

18  writ of habeas corpus.  (Dkt. No. 1.)[2]  After careful consideration of the parties' briefing, the Court

19  DENIES the petition in part and STAYS the petition in part for the reasons set forth below.[3]

20                              **FACTUAL BACKGROUND**

21         Mr. Hilario was born in Guatemala and is 32 years old.  (Dkt. No. 1 at ¶¶ 20, 27, 29.)  Prior

22  to his detention, Mr. Hilario lived in Hayward, California with his partner, their two infant

23  children (who are U.S. citizens), and his partner's two teenage children (who are also U.S.

24

25  _____
    [1] Mr. Hilario is subject to a reinstated removal order.  *See Aleman Gonzalez v. Barr*, 955 F.3d 762,
26  767 (9th Cir. 2020) ("In this circuit, aliens with reinstated removal orders[ ] . . . are treated as
    detained pursuant to § 1236(a)(6).").
27  [2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
    ECF-generated page numbers at the top of the documents.
28  [3] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. §
    636(c).  (Dkt. Nos. 4, 5, 7.)

United States District Court
Northern District of California

citizens).  (*Id.* at ¶ 28.)

Mr. Hilario first entered the United States without lawful admission in 2004.  (*Id.* at ¶ 29.)  On January 18, 2012, he was transferred to ICE custody shortly after being arrested by the Hayward Police Department for misdemeanor trespassing.[4]  (*Id.*)  The arrest stemmed from Mr. Hilario entering his current partner's apartment by breaking a glass door after she denied him entry because he was intoxicated.  (Dkt. No. 1-2 at 27.)

After ICE filed a Record of Deportable/Inadmissible Alien as to Mr. Hilario, (*Id.* at 132), an Immigration Judge ("IJ") ordered his removal to Guatemala on February 1, 2012, (*Id.* at 135).  He was deported two weeks later.  (*Id.* at 120.)  Mr. Hilario fled Guatemala sometime thereafter due to continuous and escalating threats of violence from gang members, and entered the United States without lawful admission in 2014.  (Dkt. Nos. 1 at ¶ 30 & 1-2 at 140.)

In August 2015, Mr. Hilario was convicted of misdemeanor battery pursuant to California Penal Code § 242.  (Dkt. Nos. 1 at ¶ 32 & 1-2 at 195-96.)  The conviction arose out of his arrest following a physical altercation with another individual while Mr. Hilario was intoxicated.  (Dkt. No. 1 at ¶ 32.)  Mr. Hilario was sentenced to 30 days in jail, 3 years of probation, and ordered to pay a fine.  (Dkt. No. 1-2 at 195-96.)  He served part of his sentence through the Alameda County Sheriff's Department's "Weekend Work Program."  (*Id.* at 195, 197.)

Mr. Hilario was arrested again on February 28, 2019 after the Hayward Police Department responded to a domestic disturbance at his home.  (Dkt. No. 1 at ¶ 33.)  According to the arrest report, Mr. Hilario "was extremely intoxicated" when he arrived home around 11:00 p.m. and began fighting with his family.  (Dkt. No. 1-2 at 124.)  The report states that Mr. Hilario threw 2 beer bottles at his "step daughter," struck someone over the head with a bottle, and punched multiple family members and a family friend who tried to intervene and stop him.  (*Id.* at 124-26.)  The report describes visible injuries to several people, including Mr. Hilario and his partner, and notes that paramedics treated one victim for her injuries at the scene.  (*Id.* at 126, 128.)  The report

United States District Court
Northern District of California

---

[4] Mr. Hilario's counsel attests that Mr. Hilario was transferred to ICE custody prior to the resolution of the charges stemming from his arrest, and the charges were ultimately dismissed by the Superior Court of California, County of Alameda.  (Dkt. No. 1-2 at 2.)

states that "[a]ll victims involved in the incident declined prosecution against [Mr. Hilario]."  (*Id.* at 124.)

A March 2019 state court filing indicates that Mr. Hilario was charged with two felonies—assault with a deadly weapon, "corporal injury to spouse/cohabitant/child's parent"—and two misdemeanor counts of battery stemming from the February 2019 incident.  (Dkt. No. 1-2 at 198.)  Mr. Hilario pleaded "not guilty" to the charges.  (*Id.*)  The charges were subsequently dismissed in April 2019 for "lack of complaining witness."  (Dkt. No. 1-3 at 3 ("People are not ready to proceed.  Several unsuccessful attempts made to serve complaining witness.").)

On August 23, 2019, ICE arrested Mr. Hilario near his residence, detained him, and served him with a Notice of Intent/Decision to Reinstate Prior Order based on the February 2012 removal order.[5]  (Dkt. Nos. 1 at ¶ 34 & 1-2 at 117-121.)  Mr. Hilario was subsequently interviewed by an asylum officer, who determined that Mr. Hilario "had a reasonable fear of torture if removed to Guatemala."  (Dkt. No. 1 at ¶ 35.)  Thus, on September 12, 2019, "DHS filed a Notice of Referral to an Immigration Judge [ ], initiating withholding-only proceedings before the San Francisco Immigration Court," pursuant to 8 C.F.R. § 208.31(e).  (*Id.*)

Mr. Hilario attests that on four separate occasions between September 2019 and December 2019, he was "groped and touch . . . inappropriately" on the penis and testicles by a security guard employed by ICE while the guard was conducting a pat down search.  (Dkt. No. 1-2 at 53-55 (January 27, 2020 declaration); *see also id.* at 4, ¶¶ 13-14.)  Mr. Hilario reported the incidents to Yuba County Jail officials and submitted a declaration to the San Francisco Police Department ("SFPD").  (Dkt. No. 1 at ¶ 39.)  In connection with the SFPD investigation into the incidents, SFPD signed a "Supplement B, U Nonimmigrant Status Certification," stating that Mr. Hilario was a victim of "Abusive Sexual Contact" and "Sexual Assault."[6]  (Dkt. No. 1-2 at 48-52.)  Mr.

---

[5] Under 8 U.S.C. § 1231(a)(5), DHS may reinstate a prior order of removal if it determines that the individual "has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal."  A reinstated removal order "is not subject to being reopened or reviewed."  8 U.S.C. §1231(a)(5).  However, individuals "with reinstated removal orders may pursue limited forms of relief from removal, including withholding of removal and protection pursuant to the Convention Against Torture."  *Aleman*, 955 F.3d at 767.

[6] During Mr. Hilario's April 10, 2020 custody redetermination hearing, the Government's counsel represented that it was her "understanding that an investigation was conducted and that this was a

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Hilario's counsel attests that the certification makes Mr. Hilario "eligible to apply for U

2    Nonimmigrant Status, which, if approved, provides him with an avenue to obtain permanent

3    residency and citizenship." (Dkt. No. 1-2 at 4, ¶ 13.) As a result of the alleged incidents, Mr.

4    Hilario has sought mental health treatment at the Yuba County Jail and been diagnosed with post-

5    traumatic stress disorder ("PTSD") and adjustment disorder with depressed mood. (Dkt. Nos. 1 at

6    ¶¶ 1, 39-40 & 1-3 at 24-41.)

7         In connection with the withholding-only proceedings, on December 10, 2019 Mr. Hilario

8    filed an application for asylum and for withholding of removal pursuant to section 241(b)(3) of the

9    Immigration and Nationality Act ("INA"); that application was argued before an IJ on December

10   12, 2019. (Dkt. No. 1-2 at 143.) On January 31, 2020, the IJ denied Mr. Hilario's application for

11   withholding of removal and ordered that he be removed to Guatemala. (*Id.* at 152.) Mr. Hilario

12   filed a notice of appeal with the Board of Immigration Appeals ("BIA") on February 14, 2020.

13   (*Id.* at 4, 56.) The BIA has yet to issue a briefing schedule regarding that appeal. (*Id.*)

14        The San Francisco Immigration Court scheduled Mr. Hilario for a custody redetermination

15   hearing ("*Aleman* bond hearing")[7] to occur on February 19, 2020. (*Id.* at 15.) Mr. Hilario's

16   counsel was unavailable on that date, and on March 13, 2020, Mr. Hilario requested another bond

17   hearing. (*Id.*) The IJ granted the request on March 24, 2020. (*Id.* at 105.)

18        In connection with the hearing, Mr. Hilario's partner submitted a declaration attesting to a

19   markedly different version of events than those described in the February 2019 police report,

20   characterizing the incident as "a big misunderstanding." (*Id.* at 25-26, ¶¶ 4-5.) Mr. Hilario's

21   partner's daughter and son, and several of Mr. Hilario's friends also submitted statements in

22   support of his release. (*Id.* at 35, 37-47, 159-64.) Further, Mr. Hilario submitted several

23   documents indicating his plans if released, including mental health treatment, Alcoholics

24   Anonymous, and English classes. (*Id.* at 57-72.) Mr. Hilario also submitted the birth certificates

25

26   normal pat down and that no charges will be filed." (Dkt. No. 1-3 at 17.)
     [7] An *Aleman* bond hearing is required for individuals detained pursuant to 8 U.S.C. § 1231(a)(6)
27   for longer than 180 days; the government has the burden of justifying continued detention on the
     basis that the detainee is either a flight risk or a danger to the community. *Aleman Gonzalez v.*
28   *Sessions*, 325 F.R.D. 616, 619 (N.D. Cal. 2018), *aff'd*, *Aleman Gonzalez v. Barr*, 955 F.3d 762
     (9th Cir. 2020).

1    of his two U.S.-born children, his residential lease, and copies of his tax returns.  (*Id.* at 33-34, 73-

2    81.)

3              On April 10, 2020, an IJ conducted the *Aleman* bond hearing and issued an order that Mr.

4    Hilario remain detained without bond.  (Dkt. No. 1-3 at 7.)  During the hearing, Mr. Hilario's

5    counsel objected to certain evidence submitted by DHS; specifically, counsel objected to the

6    inclusion of Mr. Hilario's rap sheet because it contained outdated information and did not specify

7    that the charges stemming from Mr. Hilario's February 2019 arrest were ultimately dismissed,

8    another document erroneously listed several charges as pending when they had been dismissed,

9    and the police report of the February 2019 arrest "contain[ed] multiple levels of hearsay" and was

10   "in conflict with other evidence."  (*Id.* at 10-11.)  The IJ stated that he would "apply the

11   appropriate weight based on counsel's comments" and objections.  (*Id.*)  After hearing argument

12   from both parties, the IJ determined on the record that Mr. Hilario was "a danger to the

13   community in consideration of the criminal history documents" and "a flight risk in consideration

14   of his immigration history," and ordered that he be held without bond.  (*Id.* at 18.)

15             On April 13, 2020, Mr. Hilario filed an appeal with the BIA regarding the IJ's custody

16   determination.  (*Id.* at 22.)  That appeal is pending.  Mr. Hilario's counsel attests that, in her

17   experience, "BIA appeals of bond proceeding[s] take anywhere from four to six months."  (Dkt.

18   No. 1-2 at 5, ¶ 17.)

19             On May 1, 2020, the IJ issued a memorandum decision regarding his bond determination.

20   (Dkt. No. 9-13, Ex. L.)  The decision notes that DHS "is required to establish, by clear and

21   convincing evidence that [Mr. Hilario's] continued detention is justified because [he] is a danger

22   to the community or a flight risk," and the IJ concludes that DHS met that burden.  (*Id.* at 3 (citing

23   *Aleman*, 325 F.R.D. at 619).)  The IJ's findings discuss Mr. Hilario's contacts with law

24   enforcement, the February 2019 police report detailing arrests "for felony assault and felony

25   domestic violence," Mr. Hilario's partner's declaration, his "strong family ties to the United

26   States," and his rehabilitation plan.  (*Id.* at 4.)  The IJ acknowledged Mr. Hilario's "mental-health

27   and alcohol-abuse issues," but determined that 'the extensiveness, nature, and recency of [Mr.

28   Hilario's] criminal record prevents his release during the pendency of his proceedings."  (*Id.*)  The

United States District Court
Northern District of California

5

1    IJ further concluded that DHS has met its burden of demonstrating by clear and convincing

2    evidence that Mr. Hilario is a flight risk based on his "demonstrated . . . willingness to violate

3    immigration laws" by twice entering the United States without lawful admission, use of "two

4    different names and two different dates of birth," and the January 2020 order of removal.  (*Id.* at

5    5.)

6                              **PROCEDURAL HISTORY**

7            On April 29, 2020, Mr. Hilario filed this petition for writ of habeas corpus pursuant to 28

8    U.S.C. § 2241.  (Dkt. No. 1.)  Thereafter the Court issued an order to show cause as to why the

9    petition should not be granted.  (Dkt. No. 8.)  The Government ("Respondents") responded on

10   May 11, 2020.  (Dkt. No. 9.)  Mr. Hilario filed a traverse on May 13, 2020.  (Dkt. No. 10.)

11                                 **JURISDICTION**

12           A district court may grant a writ of habeas corpus when a petitioner is "in custody in

13   violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).

14   "[T]he Fifth Amendment entitles aliens to due process of law in deportation proceedings."

15   *Denmore v. Kim*, 538 U.S. 510, 523 (2003).  Here, Mr. Hilario argues that his continued detention

16   violates his due process rights.  Thus, the Court has subject-matter jurisdiction pursuant to section

17   2241.

18           Respondents challenge the Court's jurisdiction over this matter on the grounds that

19   "Petitioner is confined in the Eastern District of California and [his] immediate custodians are in

20   the Eastern District of California."  (Dkt. No. 9 at 7.)  Thus, Respondents assert that venue in the

21   Northern District of California is improper, and "only the U.S. District Court for the Eastern

22   District of California has jurisdiction over Petitioner's challenge to his detention."  (Dkt. No. 9 at

23   18.)  Respondents are wrong.

24           ICE's website identifies the "San Francisco Field Office" as the federal entity that oversees

25   immigration detainees at the Yuba County Jail, and specifically directs "Feedback or Complaints"

26   to the "Field Office Director, Enforcement and Removal Operations" located in San Francisco,

27   California.  *See* https://www.ice.gov/detention-facility/yuba-county-jail.  Thus, Mr. Hilario

28   properly named David Jennings, Director of the San Francisco Field Office, as a respondent in this

United States District Court
Northern District of California

1   action.  *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1183 (N.D. Cal. 2017) ("[A] petitioner

2   held in federal detention in a non-federal facility pursuant to a contract should sue the federal

3   official most directly responsible for overseeing that contract facility when seeking a habeas

4   writ.").  The San Francisco Field Office is located within this Court's territorial jurisdiction.

5   Accordingly, the Northern District is the proper forum to hear this habeas petition.  *See id*. at 1187

6   ("So long as the proper respondent falls within this Court's territorial jurisdiction, habeas

7   jurisdiction exists.") (citing *Rumsfield v. Padilla*, 542 U.S. 426, 442-44 (2004)).

8            Respondents submit the declaration of Dana L. Fishburn, who is an Assistant Field Office

9   Director with the DHS, ICE, Enforcement and Removal Operations in the San Francisco Field

10   Office.  (Dkt. No. 9-5, Ex. D at ¶ 1.)  Ms. Fishburn attests that she is "currently assigned to the

11   Sacramento Sub-Office within the San Francisco Field Office which is responsible for oversight of

12   the ICE Detainees held at Yuba County Jail in Marysville, California."  (*Id.*)  Respondents argue

13   that Ms. Fishburn is "the ICE official most directly responsible for overseeing" the Yuba County

14   Jail, and because she is assigned to the Sacramento Sub-Office, which is located in the Eastern

15   District of California, venue is improper in the Northern District.  (Dkt. No. 9 at 18 (citing

16   *Saravia*, 280 F. Supp. at 1183 (N.D. Cal. 2017)).

17            Respondents' argument is not well taken.  Ms. Fishburn's assignment to a "sub-office" that

18   is physically located in the Eastern District of California does not mean that San Francisco Field

19   Office is not the controlling entity for the Yuba County Jail.  As the Assistant Field Office

20   Director of the *San Francisco Field Office*, Ms. Fishburn takes orders from the Director of the *San*

21   *Francisco Field Office*, Mr. Jennings.  Thus, Mr. Jennings is the federal official most directly

22   responsible for overseeing the Yuba County Jail.  Accordingly, the Northern District is the proper

23   forum to hear this action and the Court has jurisdiction.  *See, e.g.*, *Ortuno v. Jennings*, No. 20-cv-

24   02064-MMC, 2020 WL 2218965, at *2 (N.D. Cal. May 7, 2020) (finding Northern District proper

25   forum in immigration habeas case involving Yuba County Jail detainees and naming Mr. Jennings

26   as respondent); *Zepeda-Rivas v. Jennings*, No. 20-cv-02731-VC, 2020 WL 2059848, at *2 (N.D.

27   Cal. Apr. 29, 2020) (same); *Doe v. Barr*, No. 20-cv-02263, 2020 WL 1984266, at *5 (N.D. Cal.

28   Apr. 27, 2020) (same).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Respondents' reliance on a recent Ninth Circuit order does not counsel a different result.

2    Respondents assert that the Ninth Circuit issued an order on April 30, 2020, "indicating the

3    Eastern District of California has jurisdiction over immigration habeas cases filed by detainees

4    held at [Yuba County Jail]."  (Dkt. No. 9 at 17 (citing *Birru v. Barr*, No. 19-72758, Dkt. No. 14-1

5    (9th Cir. 2020)).)  However, the cited order merely states, in pertinent part:

6
           [W]e construe petitioner's motion for release from detention as a
7          petition for a writ of habeas corpus and transfer it to the Eastern
           District of California, where petitioner is being held at the Yuba
8          County Jail, to be considered under 28 U.S.C. § 2241. *See id.* §
           2241(b) (a circuit court may "transfer the application [for a writ of
9          habeas corpus] for hearing and determination to the district court
           having jurisdiction to entertain it").

10    (Dkt. No. 10-1, Ex. L at 7.)  Unlike here, the petitioner in *Birru* named only United States

11    Attorney General William Barr as a respondent, and the court did not address whether jurisdiction

12    was proper in any other District.  Instead, the court transferred the petition to the Eastern District

13    of California solely on the basis that the petitioner was detained in that District.  Thus, *Birru* offers

14    no insight into whether the Northern District is the proper forum to hear *this* petition.[8]  As

15    previously discussed, the Court is satisfied that it has subject-matter jurisdiction over this action

16    pursuant to section 2241 and that the Northern District is the proper forum because the Director of

17    the San Francisco Field Office is appropriately named as a respondent.

18                                      **DISCUSSION**

19    Mr. Hilario sets forth two claims challenging the constitutionality of his detention: (1)

20    violation of his Fifth Amendment due process rights based on the Government's failure to

21    establish that he is a danger to the community or flight risk; and (2) violation of his Fifth

22    Amendment due process rights based on his continued detention during the COVID-19 pandemic.

23    Mr. Hilario seeks immediate release under both claims; in the alternative, Mr. Hilario requests

24    release within 7 days of the Court's order unless he is provided with a bond hearing that comports

25

26    ─────────────────
[8] Prior to the Ninth Circuit's April 30 order, the petitioner in *Birru* filed a habeas petition in a
27    related action in this District.  *See Birru v. Barr, et al.*, No. 20-cv-01285-LHK, 2020 WL 1905581,
      at *1 (N.D. Cal. Apr. 17, 2020).  There is no indication that respondents in that action argued that
28    the court lacked jurisdiction or that venue was improper based on the petitioner's detention at the
      Yuba County Jail.

with due process.  (*See* Dkt. No. 1 at 47.)

Respondents assert that Mr. Hilario's first claim fails because: (1) he has not exhausted his administrative remedies; (2) the Court lacks jurisdiction to review the IJ's discretionary decision to deny bond; and (3) even if the Court reaches the merits, the petition fails to state a due process violation.  As for Mr. Hilario's COVID-19 claim, Respondents argue that the claim should be stayed because it "arise[s] out of the same facts, turn[s] on the same cause of action, and request[s] the same relief" at issue in the pending class action *Zepeda-Rivas v. Jennings*, No. 20-cv-02731-VC (N.D. Cal.) ("*Zepeda-Rivas*"), which was filed before this action and involves a provisionally certified class of Yuba County Jail detainees.  (Dkt. No. 9 at 29.)

The Court addresses Mr. Hilario's claims in turn.

## I.    Due Process Claim Based on IJ's April 2020 Bond Determination

### A.    Exhaustion of Administrative Remedies

"Exhaustion can be either statutorily or judicially required."  *Acevedo-Carranza v. Ashcroft*, 371 F.3d 539, 541 (9th Cir. 2004).  Statutory exhaustion "may be a mandatory requirement that is jurisdictional."  *Id.*  "If, however, exhaustion is a prudential requirement, a court has discretion to waive the requirement."  *Id.*

As previously discussed, "[d]istrict courts are authorized by 28 U.S.C § 2241 to consider petitions for habeas corpus."  *Castro-Cortez v. INS*, 239 F.3d 1037, 1047 (9th Cir. 2001), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006).  Section 2241 "does not specifically require petitioners to exhaust direct appeals before filing petitions for habeas corpus."  *Id.*  However, the Ninth Circuit "require[s], as a prudential matter, that habeas petitioners exhaust available judicial and administrative remedies before seeking relief under § 2241."  *Id.*

Once a detainee receives a bond hearing before an IJ he may appeal the IJ's decision to the BIA.  *Leonardo v. Crawford*, 646 F.3d 1157, 1159 (9th Cir. 2011). If the detainee disagrees with the BIA's decision on appeal he may "file a habeas petition in the district court" to challenge his continued detention.  *Id.*  Thereafter, "the district court's decision on the habeas petition may be appealed" to the Ninth Circuit.  *Id.*  Thus, pursuing habeas review of the IJ's adverse bond

1    determination before the BIA has issued its decision on appeal is improper.  *Id.* at 1160.  "When a

2    petitioner does not exhaust administrative remedies, a district court ordinarily should either

3    dismiss the petition without prejudice or stay the proceedings until the petitioner has exhausted

4    remedies, unless exhaustion is excused."  *Id.*

5        "[C]ourts may require prudential exhaustion if (1) agency expertise makes agency

6    consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of

7    the requirement would encourage the deliberate bypass of the administrative scheme; and (3)

8    administrative review is likely to allow the agency to correct its own mistakes and to preclude the

9    need for judicial review."  *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007) (internal quotation

10   marks and citation omitted).  However, "even if the three *Puga* factors weigh in favor of

11   prudential exhaustion, a court may waive the prudential exhaustion requirement if administrative

12   remedies are inadequate or not efficacious, pursuit of the administrative remedies would be a futile

13   gesture, irreparable injury will result, or the administrative proceedings would be void."

14   *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017) (internal quotation marks and citation

15   omitted).

16       There is no dispute that Mr. Hilario has failed to exhaust his administrative remedies;

17   indeed, he has two BIA appeals pending.  Respondents assert that allowing Mr. Hilario "to seek

18   direct habeas review of the IJ's decision without first appealing to the BIA would prevent the BIA

19   from correcting any mistake that might exist and also 'encourage the deliberate bypass of the

20   administrative scheme.'"  (Dkt. No. 9 at 20 (quoting *Puga*, 488 F.3d at 815).)  The Court agrees

21   that the *Puga* factors, primarily the second and third factors, weigh in favor of requiring prudential

22   exhaustion.

23       Mr. Hilario argues that the Court should waive prudential exhaustion on the grounds that

24   "he is suffering irreparable harm by his continued unlawful detention"; specifically, Mr. Hilario

25   asserts that he "has been detained for over eight months without a constitutionally compliant bond

26   hearing before a neutral adjudicator."  (Dkt. No. 1 at ¶¶ 63-64.)  The Court rejects that argument

27   because it "begs the constitutional questions presented in his petition by assuming that petitioner

28   has suffered a constitutional injury."  *See Francisco Cortez v. Nielsen*, No. 19-cv-00754-PJH,

United States District Court
Northern District of California

United States District Court
Northern District of California

1   2019 WL 1508458, at *3 (N.D. Cal. Apr. 5, 2019) (rejecting irreparable harm argument premised

2   on allegedly unconstitutional bond hearing at issue in underlying habeas petition).

3          Mr. Hilario further argues that waiting for the BIA to adjudicate the IJ's bond

4   determination may take up to six months and his continued detention during that time will

5   irreparably harm his mental health because his detention exacerbates his PTSD symptoms.  (Dkt.

6   Nos. 1 at ¶¶ 66-67 & 1-3 at 24-41.)  The Court agrees that in the unique circumstances of this case

7   at this particular time, Mr. Hilario's mental health condition warrants a waiver of the exhaustion

8   requirement.  Since being detained Mr. Hilario has sought mental health treatment at the Yuba

9   County Jail and been diagnosed with PTSD stemming from his alleged sexual assault and

10  continued detention.  Such "significant psychological effects from his detention" demonstrate a

11  likelihood of irreparable harm sufficient to excuse prudential exhaustion.  *See De Paz Sales v.*

12  *Barr*, No. 19-cv-07221-KAW, 2020 WL 353465, at *4 (N.D. Cal. Jan. 21, 2020).

13         Accordingly, Mr. Hilario is excused from exhaustion.

14  **B.     Judicial Review of IJ's April 2020 Bond Determination**

15         Respondents next assert that the Court lacks jurisdiction to review the IJ's discretionary

16  decision to deny bond because it is not subject to judicial review.  Respondents rely on 8 U.S.C. §

17  1226(e), which addresses "Judicial review":

18         The Attorney General's discretionary judgment regarding the
           application of *this section* shall not be subject to review.  No court
19         may set aside any action or decision by the Attorney General under
           this section regarding the detention or release of any alien or the grant,
20         revocation, or denial of bond or parole.

21  8 U.S.C. § 1226(e) (emphasis added).  The initial problem with Respondents' argument is that Mr.

22  Hilario is not detained pursuit to *section 1226*; instead, it is undisputed that he is detained under

23  section *1231(a)(6).*  Thus, it is unclear whether section 1226(e) is even applicable here.  Further,

24  even if section 1226(e) did apply, "[t]he Ninth Circuit has made clear that a district court retains

25  jurisdiction, notwithstanding section 1226(e), to review legal and constitutional challenges to bond

26  determinations, which are not challenges to discretionary determinations."  *Ramos v. Sessions*, 293

27  F. Supp. 3d 1021, 1028 (N.D. Cal. 2018) (rejecting jurisdictional argument premised on section

28  1226(e) regarding petitioner detained under section 1231 because petitioner brought "a

1    constitutional and legal challenge to the IJ's bond determination, arguing that it failed to comply

2    with due process") (citing *Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011) (noting that

3    "although the Attorney General's discretionary judgment . . . shall not be subject to review, claims

4    that the discretionary process itself was constitutionally flawed are cognizable in federal court")).

5         Respondents assert that Mr. Hilario's claims, "although dressed in constitutional garb,

6    simply reflect a disagreement with how the IJ weighed the evidence." (Dkt. No. 9 at 21.) Not so.

7    As Mr. Hilario's traverse makes clear, his petition attacks the discretionary process itself by

8    asserting that the Government failed to meet its evidentiary burden of showing by clear and

9    convincing evidence that he was a danger to the community or a flight risk, and the IJ's decision

10   that the Government *did* meet its burden thus reflects legal error. (*See* Dkt. No. 10 at 10-11.)

11   Accordingly, the Court joins other courts in this district that have exercised jurisdiction over

12   petitions challenging IJ bond determinations on constitutional grounds where, as here, the

13   petitioner challenged the quantum of evidence supporting the IJ's determination that the

14   Government met its evidentiary burden by clear and convincing evidence. *See, e.g., Perez v. Wolf*,

15   No. 5:19-cv-05191-EJD, 2020 WL 1865303, at *4 (N.D. Cal. Apr. 14, 2020); *Jimenez v. Wolf*, No.

16   19-cv-07996-NC, 2020 WL 1082648, at *2 (N.D. Cal. Mar. 5, 2020); *Ramos*, 293 F. Supp. 3d at

17   1028; *Obregon v. Sessions*, No. 17-cv-01463-WHO, 2017 WL 1407889, at *4-5 (N.D. Cal. Apr.

18   20, 2017).

19        **C.    Whether the IJ's April 2020 Bond Determination Violated Due Process**

20        Due process required DHS to show by clear and convincing evidence that Mr. Hilario was

21   a danger to the community or a flight risk at the time of the April 2020 bond hearing. *See Diouf v.*

22   *Napolitano*, 634 F.3d 1081, 1092 (9th Cir. 2011) (holding "that an alien facing prolonged

23   detention under § 1231(a)(6) is entitled to a bond hearing before an immigration judge and is

24   entitled to be released from detention unless the government establishes that the alien poses a risk

25   of flight or a danger to the community"). An IJ's determination that an individual is a flight risk

26   or poses a danger to the community is guided by the following factors:

27             1) whether the alien has a fixed address in the United States; (2) the
               alien's length of residence in the United States; (3) the alien's family
28             ties in the United States, and whether they may entitle the alien to

United States District Court
Northern District of California

reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States.

*Singh*, 638 F.3d at 1206 n.5 (citing *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006)). "Although an alien's criminal record is surely relevant to a bond assessment . . . criminal history alone will not always be sufficient to justify denial of bond on the basis of dangerousness. Rather, the recency and severity of the offenses must be considered." *Id.* at 1206. An IJ need not mechanically address every *Guerra* factor in making a bond determination. *See Guerra*, 24 I. & N. Dec. at 40 (noting that the IJ's consideration "may include any or all" of the *Guerra* factors and the IJ "may choose to give greater weight to one factor over others, as long as the decision is reasonable").

"Case law demonstrates that establishing dangerousness by 'clear and convincing evidence' is a high burden and must be demonstrated in fact, not 'in theory.'" *Obregon*, 2017 WL 1407889, at *7. It is not sufficient for the IJ to merely state the clear and convincing standard correctly; the IJ's determination must apply the standard correctly. *Ramos*, 293 F. Supp. 3d at 1030 (collecting cases). In reviewing the IJ's determination, district courts "may not second-guess the [IJ's] weighing of the evidence." *Calmo v. Sessions*, No. C 17-07124-WHA, 2018 WL 2938628, at *4 (N.D. Cal. June 12, 2018). A court's review is instead limited to whether the IJ's decision reflects "clear legal error" or is unsupported by sufficient evidence. *See id.* at 4-5.

### 1.    Danger to the Community

The IJ's decision discusses Mr. Hilario's criminal history, including his sole conviction for misdemeanor battery in 2015, but the majority of the decision details the February 2019 incident as described in the arrest report. After reviewing that evidence, the IJ concluded:

[T]he respondent has been arrested for serious offenses relating to persons and property. . . . . The respondent seeks to return to his home where he previously assaulted his partner, her child, and a family friend. The Court is cognizant of the respondent's mental-health and alcohol-abuse issues, but the Court simply cannot find that his continued detention and future rehabilitation efforts overcome the evidence of his potential dangerousness. Put simply, the

United States District Court
Northern District of California

extensiveness, nature, and recency of the respondent's criminal record
prevents his release during the pendency of his proceedings.

(Dkt. No. 9-13, Ex. L at 4.)

The gravamen of Mr. Hilario's petition is that the IJ erred in relying on the February 2019 arrest report because Mr. Hilario pleaded not guilty to the charges stemming from that arrest, the charges were subsequently dismissed, and Mr. Hilario's partner attested to a different version of events.  Without citing any law, Mr. Hilario argues that "[a]n unsubstantiated police report outlining past conduct, which was never relied on by the criminal court to make a single finding, in a case where the charges were dismissed and no conviction resulted cannot constitute probative and specific evidence sufficient to meet the government's heavy burden of proof as to future dangerousness."  (Dkt. No. 10 at 12-13; *see also* Dkt. No. 1 at ¶¶ 79-80 (suggesting that the IJ erred in even considering the February 2019 arrest report because such evidence has "no evidentiary value" under the Federal Rules of Evidence).)  Mr. Hilario is wrong.  *See, e.g., Singh*, 638 F.3d at 1209-10 (rejecting argument that petitioner's due process rights were violated when IJ admitted unauthenticated rap sheet into evidence and noting that "[t]he Federal Rules of Evidence do not apply strictly in immigration removal proceedings") (internal quotation marks and citation omitted); *Baliza v. INS*, 709 F.2d 1231, 1233 (9th Cir. 1983) (noting that immigration proceedings are not "bound by strict rules of evidence,").

An IJ may rely "upon any information that is available . . . or that is presented to him or her" by either party.  8 C.F.R. § 1003.19(d); *see also Guerra*, 24 I. & N. Dec. at 39 ("In the context of custody redeterminations, [IJs] are not limited to considering only criminal convictions in assessing whether an alien is a danger to the community.  Any evidence in the record that is probative and specific can be considered.") (emphasis and footnote omitted).  The February 2019 arrest report was detailed, specific, and probative.  Thus, the IJ did not err in considering it.

Mr. Hilario further argues that notwithstanding the February 2019 arrest report, the Government failed to produce enough evidence that clearly and convincingly showed that he is a danger given that the charges stemming from the arrest report were dismissed, his partner attested that he is not violent person and the February 2019 incident was a "misunderstanding," and he presented a rehabilitation plan.  The Court is not persuaded that the IJ committed constitutional

14

1   error.  The IJ noted that the alleged victims of the February 2019 incident did not want to

2   prosecute, and even considered that Mr. Hilario might never have been formally charged.  The IJ

3   also considered Mr. Hilario's partner's declaration and the "letters of support from family and

4   friends," his "strong family ties to the United States," and his "rehabilitation plan if released."

5   (*See* Dkt. No. 9-13, Ex. L at 4.)  After considering the evidence, the IJ found that Mr. Hilario

6   "seeks to return to his home where he previously assaulted his partner, her child, and a family

7   friend."  (*See id.*)  That finding did not violate due process and was instead supported by the

8   detailed facts set forth in the February 2019 arrest report.

9          The arrest report recounted that one female victim had "a contusion and redness below her

10   right eye, and a contusion to her right hand."  Another "had a contusion to the top of her head and

11   a complaint of pain to her head" and "also sustained a laceration to her left hand middle finger,

12   scratches to her neck, and redness to her face."  Yet another was not injured after Mr. Hilario hit

13   her in the head and "pulled her hair."  (Dkt. No. 1-2 at 124.)  Nothing in Mr. Hilario's partner's

14   declaration suggests that these statements in the arrest report are false; to the contrary, she states

15   that she had to hold him down.  (*See id.* at 26, ¶ 4.)  Further, the arrest report includes statements

16   from Mr. Hilario's step-daughter regarding Mr. Hilario's assault on her—nothing in the record

17   contradicts her statement.  It did not violate due process for the IJ to decline to release Mr. Hilario

18   to return to live with the very persons the record suggests he assaulted just last year while

19   intoxicated.

20          Mr. Hilario's reliance on this Court's decision in *Ortega-Rangel v. Sessions*, 313 F. Supp.

21   3d 993 (N.D. Cal. 2018) is unpersuasive because that case is easily distinguishable.  First, the IJ in

22   *Ortega-Rangel* purportedly based his determination that the petitioner was a danger to the

23   community "on the totality of evidence of record," but cited *only* a single arrest for possession for

24   sale of a controlled substance.  *See* 313 F. Supp. 3d at 999, 1004.  Putting aside that the possession

25   of drugs for sale poses a very different danger than returning someone to the same home where

26   there is reason to believe the person engaged in domestic violence, in *Ortega-Rangel* there were

27   no details in the police report or declaration supporting the petitioner's arrest to suggest that she

28   had sold drugs.  *Id.*  Here, there can be no reasonable dispute that Mr. Hilario was directly

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1    involved in the incident described in the February 2019 arrest report—domestic violence that

2    resulted in injuries to family members and a friend.  Second, other facts before the IJ in *Ortega-*

3    *Rangel* showed that the petitioner: (1) had no criminal record outside of the arrest at issue; (2) had

4    lived in the United States continuously for 18 years; and (3) had no other contact with immigration

5    authorities since her entry.  *Id.* at 998.  Here, the facts before the IJ showed: (1) multiple arrests;

6    (2) a conviction for battery; and (3) a previous instance of unlawful entry that resulted in Mr.

7    Hilario's deportation.  Simply put, *Ortega-Rangel* does not help Mr. Hilario.

8         Mr. Hilario's reliance on *Obregon v. Sessions* is similarly unpersuasive.  There the IJ

9    found that the petitioner was a danger to the community based primarily on her past DUI

10    convictions and four convictions for driving with a suspended license.  2017 WL 1407889, at *7.

11    In reviewing the IJ's determination, the court found that it was "a close question whether [the]

12    petitioner received the due process that was due her" in light of the nature and remoteness of the

13    offenses and the petitioner's history of treatment for alcohol abuse.  *See id.* at *7-8.  The court

14    concluded that a new bond hearing was warranted, but in doing so found "the timing of

15    [petitioner's] motion" significant; specifically, petitioner had already been detained for 14 months

16    at that point and the bond hearing at issue had occurred over 4 months prior.  *See id.* at *8 ("But

17    the timing of her motion is such that the remedy is at hand: it is time for a new . . . bond hearing

18    that assesses her present dangerousness based on all the relevant evidence and determines whether

19    the government has demonstrated, by clear and convincing evidence, that there are no less

20    restrictive alternatives to detention.").

21         Here, the record presents no such "close question."  The IJ's decision reflects consideration

22    of Mr. Hilario's contacts with law enforcement for crimes against persons and property—with

23    special attention to his most recent arrest for an incident of domestic violence resulting in injury—

24    and concluded that the evidence in support of Mr. Hilario's release did not mitigate the danger to

25    the community; specifically, the same community injured as a result of the February 2019

26    incident.  Further, unlike in *Obregon*, the length of Mr. Hilario's detention and remoteness of his

27    April 2020 bond hearing do not factor into the analysis of whether a new bond hearing is

28    warranted.

United States District Court
Northern District of California

1    In sum, the IJ's April 2020 bond determination does not reflect a constitutional violation.

2    Because the Government needed to prove by clear and convincing evidence that Mr. Hilario is

3    *either* a danger to the community *or* a flight risk to warrant continued detention, the Court need

4    not address the IJ's determination as to the latter.  Accordingly, the Court denies in part Mr.

5    Hilario's petition.

6    **II.    Due Process Claim Based on COVID-19 Pandemic**

7    As previously discussed, Mr. Hilario has sought mental health treatment since being

8    detained and has been diagnosed with post-traumatic stress disorder ("PTSD") and adjustment

9    disorder with depressed mood attributed to four instances of alleged "sexual groping" by an ICE

10   employee.  (Dkt. Nos. 1 at ¶ 1 & 1-3 at 24-41.)  Mr. Hilario asserts that his mental condition puts

11   him at a heightened risk for infection during the COVID-19 pandemic, and that the conditions of

12   confinement at the Yuba County Jail violate his due process rights under the Fifth Amendment to

13   be detained in a safe, humane manner due to the risk of a widespread outbreak of COVID-19 at

14   the jail.  Mr. Hilario's COVID-19 claim seeks immediate release from custody.  Respondents

15   counter that the Court should stay Mr. Hilario's COVID-19 claim because he is member of the

16   *Zepeda-Rivas* class and his second claim in this action seeks the same relief as sought in that case.

17   The Court agrees that a stay is warranted.

18   The background of the COVID-19 pandemic in general and the conditions at the Yuba

19   County Jail in particular have been detailed in recent cases and the Court incorporates that

20   background here.  *See, e.g.*, *Zepeda-Rivas*, 2020 WL 2059848, at *2; *Doe*, 2020 WL 1984266, at

21   *3; *Ortuno*, 2020 WL 1701724, at *1-4 (N.D. Cal. Apr. 8, 2020).  It suffices to say that COVID-

22   19 is a highly infectious disease and the conditions of confinement at the Yuba County Jail make it

23   impossible for detainees to practice social distancing as ordered by the State of California on

24   March 19, 2020 to curb the spread of the disease.  *See* Cal. Executive Order N-33-20, available at

25   https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf; *see also*

26   www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/get-ready.html.

27   On April 29, 2020, Judge Chhabria issued a temporary restraining order ("TRO") in

28   *Zepeda-Rivas* and provisionally certified a class that includes current Yuba County Jail detainees.

17

2020 WL 2059848, at * 1-4.  Judge Chhabria's order requires "ICE to provide information and access to detainees to facilitate a process of considering bail requests" and provides, in pertinent part, that each class member will receive an *individual* determination regarding release on bail during the pendency of that action:

> IThe purpose of this order is to enable the Court to implement a system for considering individual bail applications, modeled after a system created and successfully implemented by Judge Young in the District of Massachusetts to release detainees on bail while their habeas cases are pending.  In extraordinary cases like this, federal judges have the authority to release detainees on bail while their habeas cases are pending.

*Id.* at *3.  Thus, Judge Chhabria's order provides for expedited, individual bail determinations for class members in light of the COVID-19 pandemic and the conditions of confinement at the Yuba County Jail.

It is undisputed that as a current Yuba County Jail detainee Mr. Hilario is a member of the *Zepeda-Rivas* class.  Further, class counsel in *Zepeda-Rivas* will submit a bail application for Mr. Hilario in that action.  (*See* Dkt. No. 10 at 17 & 10-1 at 2, ¶ 4.)  The potential relief available to Mr. Hilario in *Zepedas-Rivas*—immediate release due to the COVID-19 pandemic, the conditions of confinement at the Yuba County, and his medical vulnerabilities —is the same substantive relief sought in this action and is based on the same underlying facts.  Accordingly, a stay pending adjudication of *Zepedas-Rivas* is warranted.  *See Leyva v. Certified Grocers of California, Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979) ("A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case."); *see also Calderon v. Barr*, No. 2:20-cv-00891 KJM GGH, 2020 WL 2394287, at *4-5 (E.D. Cal. May 12, 2020) (staying Yuba County jail detainee's habeas petition seeking release due to COVID-19 pending adjudication in *Zepedas-Rivas*).

Mr. Hilario's arguments against a stay are unavailing.  First, he argues that *Zepedas-Rivas* concerns "systemic reform" at the Yuba County Jail, while his COVID-19 claim in this action seeks "his own release on account of his medical vulnerabilities."  (Dkt. No. 10 at 16 (emphasis omitted).)  Not so.  Although Judge Chhabria's order acknowledges that the "*lawsuit* is not about

United States District Court
Northern District of California

1  whether any particular person should be released" and is instead "about the conditions of

2  confinement at the facilities," in granting the requested TRO the order expressly states that "[t]he

3  *purpose of this order* is to enable the Court to implement a system for considering individual bail

4  applications." *See Zepedas-Rivas*, 2020 WL 2059848, at *3 (emphasis added).  In other words,

5  the order provides for the type of *individual* determination regarding release that Mr. Hilario seeks

6  here.  Second, Mr. Hilario asserts that adjudicating his COVID-19 claim in this action "does not

7  involve any duplicative labor."  (Dkt. No. 10 at 17.)  Again, the Court disagrees.  Because Mr.

8  Hilario asks the undersigned to engage in the same analysis, based on the same facts, and in order

9  to provide the same relief as Judge Chhabria will undertake in considering Mr. Hilario's bail

10  application in the first-filed action, there is of course a duplication of effort.

## CONCLUSION

12      For the reasons set forth above, the Court DENIES in part Mr. Hilario's petition because

13  the IJ's April 2020 bond determination did not violate due process.  The Court STAYS Mr.

14  Hilario's COVID-19 claim pending adjudication in *Zepedas-Rivas*.  The parties shall jointly

15  provide the Court with a status update on Mr. Hilario and *Zepadas-Rivas* within 30 days of this

16  Order.

17      **IT IS SO ORDERED.**

18  Dated: May 19, 2020

20  JACQUELINE SCOTT CORLEY
21  United States Magistrate Judge